that is not only reasonable but as this court has already deferred to it and recognized it as reasonable in Mughali the Oh Ouch decision and subsequent cases and Esquivel-Quintana does not provide any reason to revisit that deference. Esquivel-Quintana addressed one issue and it did so on the basis of a state offense defined solely by the age of the participants, sorry, a state sexual offense defined solely by the age of the participants. The victim must be under the age of 16. It did not get to any issue of ambiguity or whether the board's interpretation in murder of Rodriguez-Rodriguez was a reasonable interpretation of ambiguous statutory decision and therefore both because it board applied 3509 in this case and we'd ask it to be upheld on that basis. So then we come to turn to the state offenses. Mr. Osler. Okay. We found in many cases you should defer to 3905. 3905 looks like a nice definition even though it comes from a kind of procedural statute but the fact that we deferred in some cases, we have a different statute before us. Are we required by those cases to defer to that interpretation in the context of this case? I'm not, I'm just not sure what the, whether they're really binding on this case. Well, Your Honor, clearly at the last step where you're analyzing whether a state offense falls under it, that would be different. It's not binding to that effect but I do think when you're. Once you decide you're deferring to that definition, then you're kind of saying, well, all these problems like mens rea and all that stuff go away because they're not in that definition. Is that what you're saying? Yes, and Your Honor, I mean, interestingly, Esquivel-Quintana emerges, I mean, this is one reason why a petitioner makes much of the fact that the board has called it a guideline, 3509 is a guideline. That gives the board flexibility to recognize that certain offenses don't fall within the definition. If it's only a guideline, then wouldn't we ask the BIA to say, okay, now you have a problem with mens rea. How does that fit with your guideline? If it's only a guideline and not a true definition, shouldn't they have addressed that? Your Honor, except for the fact that Mr. Acevedo's two convictions both involve intentional conduct and therefore meet any standard. Yeah, there's, well, there's different mens rea as to knowing what you're doing, mens rea as to knowing how old the victim is. Right, well, if you're skipping. He may know that he's committing a sexual act or something like that. It wasn't a mistake in touching. He may know he's doing this but he has to know the age. That's a different kind of mens rea. Well, if you're looking at the mistake of age issue, then if you write out state statutes that don't provide for a mistake of age, you're writing out the majority of state statutory rape offenses. We know that in 1996, 1997, it was the vast majority of states penalized statutory rape without providing for a mistake of age defense. And it's the same reason that led the board to conclude that excludes too many. Congress would not have wanted to have, to want to exclude these kind of contacts. Also, I mean, it's notable that to look to the first conviction again, the attempted criminal sexual act in the second degree. We have a perpetrator who's at least 18 years old having oral or anal sexual conduct with an individual under the age of 15, so age 14 or younger. Notably, New York has provided a significant defense to this. When they increased the age of the victim from 13 to 14 in the year 2000, they created a defense where there was a difference of less than four years between the perpetrator and the victim, which given the other age limits, we're dealing with an older 14-year-old and someone who has just turned 18. And New York has said, not only is that a defense, you don't even need to be mistaken about the age. This is a defense under our law. And it is not, it's shown to be an outlier in this case, where the majority of states don't provide a mistake of age defense. Is the ineffective assistance counsel claim still alive? Is this possibility that state convictions will go away, or does that matter? The Supreme Court Appellate Division denied his leave to appeal. Okay. So we think that the attempt provides an intentional conduct for the first conviction. Just to turn to the second conviction, the sexual abuse in the second degree under 130.60, this does have a intent that is an element of the state offense under New York law, that it involves certain contact for the purpose of sexual gratification, not simply describing the effect on the participants, but describing a purpose and requiring the state to demonstrate the purpose. I acknowledge this Court's decisions in James and Flores, where it kind of remanded, it said, Dear Board, on remand, please take note of these state offenses. Notably, James involved a statute with older victims. I think it was at least 16, and maybe 16 and 17-year-olds. It was not confronted with a situation in which you're dealing with sexual gratification and a victim who is 13 years old or younger. In short, there's no reasonable probability that New York penalizes conduct under these statutes that falls outside the definition of sexual abuse of a minor. And if the Court has a ---- That falls outside the definition of sexual abuse of a minor under Federal law. That's right, Your Honor. As articulated. And therefore, he's an aggravated felon and ineligible for cancellation of removal. And if the Court has no further questions, thank you. Thank you, Mr. Anderson. Thank you, Your Honors. Briefly, to the extent that the government suggests that 2243 is a narrow statute, it's not. It's been amended, and I think you don't have to take my word for it. The Supreme Court says that it's relevant, and we think that that is a superior source of guidance. Importantly, Mr. Acevedo's convictions do not involve intentional conduct. This was fully briefed, but to the extent that the government is trying to use the attempt in this case to import intent, the BIA did not find on that basis, no one has analyzed this case on this basis, it's a violation of the Chenery Doctrine for the Court to reach that issue at this point, when we, the parties so far, have only reached the substantive issues in this case. And importantly, even if the Court finds that the second statute, 13060, has sort of a mens rea, we argue that it's not a true mens rea element, it's certainly not a heightened mens rea, it's more akin to negligence, if anything, this Court can still find that that statute is overbroad because of the sexual contact definition. So each statute has more than one way that it's overbroad. We're asking this Court not to remand this matter. This Court can and should decide the mens rea issue for itself. It's because these issues are not ambiguous and they can be drawn from the traditional tools of statutory construction. Your Honors, we don't dispute that Mr. Acevedo is removable. He had other grounds of removability. We are only disputing whether he's removable for an aggravated felony, which we think is in line with the hierarchy of immigration consequences that Congress intended to impose on Federal and State offenses. And if he secures relief, the relief that you're seeking for him, he would be eligible for cancellation of removal as to those other grounds. Am I understanding the immigration law correctly? Yes, Your Honor. The other grounds of removability still make him subject to the proceedings, but he would be able to have an evidentiary hearing where he'd have to show that he deserves an exercise of discretion to keep his green card. Moral turpitude and something else. Yes. He was found removable for a crime involving moral turpitude and a crime of child abuse or neglect, and we are not disputing those. We think that that is exactly in line with the idea that there's a universe of offenses and that some of them have more serious consequences than others. These statutes, because of their lack of mens rea, and because the second one is additionally overbroad as to either the government's definition or what we think is the proper Federal offense, are not aggravated felonies, and so do not trip those harsh consequences. For that reason, we're asking you to reach those issues as legal issues and remand for further proceedings. Thank you, Your Honors. Thank you. Thank you both. We'll reserve decision. The next case on for argument is Haynes v. University's superannuation in the Petrobras securities litigation. Thank you. Good morning. May it please the Court. My name is Anna St. John, and I represent the appellant, Mr. Tom Haynes. In this class action, Haynes filed an objection that indisputably increased the class's recovery by at least $46 million. But when he requested attorney's fees, the district court didn't look at whether his fees were reasonable in light of that success. Instead, it looked at the number of pages that his argument took up in his brief and excluded without explanation time that was required for him to participate in the objection process at all. The court awarded him 10% of his lodestar or less than $12,000. In Haynes v. Eckerhart, the Supreme Court held that where a party Am I right in understanding the record that the district court determined that the time entries didn't allow it to isolate the number of hours spent on the Brazilian objection? He did look at the time sheets first and found that there were only a handful of hours that could be separated out on that particular issue. So he went to the number of pages in the brief as an alternative method of estimating? That's right, Your Honor. And he adjusted it a little from there. Why was that an abusive discretion? Well, it's an abusive discretion because he didn't apply the framework of Hensley. Under Hensley, the court looks at whether — well, first, whether a party prevailed at all. Here the question arises under White v. Auerbach. Did the objector substantially enhance the benefits for the class? Clearly meets that. Clearly meets that. The next step is are there claims that are wholly distinct in this case on which a party was unsuccessful? And Hensley talks about claims. Here there weren't separate claims. Haynes was involved in a single objection process with overlapping — a common core of facts, overlapping arguments. And it was simply impossible in conducting the time sheets or filling in time for counsel to separate their time into neat little buckets. There was one declaration they looked at in analyzing the issues, and in the declaration, the Brazilian contract attorneys were not separated out. It may be difficult to separate the time, so the district court did something to account for that. But how is the claim objecting to the fees based upon the Brazilian work not distinctly different from a claim objecting to the fees in general? How is it not distinctly different from the other claims? Well, because there was a single set of papers that Haynes was analyzing in deciding whether or not the fees were reasonable. And so in looking at a list of attorneys — That makes it the same objection. He's got objections that didn't work, and then he's got one that really worked well. But they came — it all came out of a common core of facts. That's what — you're saying that's what Hensley says? That if these — if your objections or claims come out of a single set of facts, then they're not distinctly different? You're saying that's what Haynes stands — Hensley stands for? Hensley does say that where there's a common core of facts from which claims arise, they're not wholly distinct. These are not the type of claims that could be made in separate lawsuits. That was Hensley's concern. Is your point that because he's got to be in for — because he has to be in as an objector, then he's opening himself up to a variety of discovery and various other things that he has to — that has to be participated in in order just to advance the one that he was successful in? That's absolutely one component of the district court's error. It was — it certainly is the case that Haynes's work on discovery could not be separated into individual buckets of work. The discovery didn't relate to one specific argument or two specific arguments. It was a holistic set of work that Haynes had to perform to avoid being held in contempt of court just to bring the Brazilian contract attorney argument. The same is true for the declarations he filed with his objection. They didn't relate to specific arguments. He had to prove his class membership. He had to meet the requirements of the preliminary approval order. He couldn't disregard those just to bring the Brazilian contract attorney issue, and yet the district court didn't give him credit for any of that time. And so we do have a situation where the district court not only didn't look at the overall success, which is the core guiding light for lodestar analyses, it also cut out a lot of time that was closely related, required for him to bring the successful argument. Well, it awarded 10 percent of the lodestar, so it didn't — it wasn't tightly bound to the number of pages. But your argument is that wasn't enough for those hours. And if you look at the district court's order, the court specifically says, I'm going to bump this up a little because the work on that objection, editing, researching, and drafting, was novel and well done. He specifically confines that 10 percent to that argument. There's no indication that he considered the holistic effort that Haynes had to perform just to get involved in this case. So what do we give as guidance, not only to the district court in this case, but to future district courts who are wrestling with this issue? Well, I think the precedent of this Court is — goes a long way there, which is that once you do have interrelated work, and there's no dispute that at least the discovery, the investigation, the declarations were all interrelated to his argument or required for his argument, then you look at the overall degree of success. That's what Hensley says you do. And the district court never asked, is this fee request reasonable in light of the $46 million benefit? That's what the court should have done. So I'll reserve the balance of my time for rebuttal. Thank you. About three minutes. Mr. Lieberman? May it please the Court. I think there are a number of issues. First, the Hensley case itself was not addressing a case of an objector with respect to attorney's fees. What it was, was it was a class action on behalf of inmates in a prison. And there, there were six claims brought. Five of them had succeeded and one did not.  That's not what happened here. You have Haines came in after preliminary approval in May of 2018, filed a 25-page brief, and then filed a five-page, sir, apply, engage in discovery. And the court didn't find that effort to be all that helpful. It's important to take a step back at the preliminary approval hearing. That's the standard? Is what the standard? All that helpful? Well, the standard is which claims are successful versus which is not. The court did, through its discretion, look at whether or not arguments advanced the analysis or did not. And the court found that only one of the six issues raised by, by Haines were helpful. That's what the court had held. And very importantly, at the preliminary approval hearing. He was the only objector, the only one who made this argument. The only, he's the only one who made. I mean, there was billing for over $49 million.  And so the court then gave an award of fees here based on the work that was done. You have to, you do have to look at the holistic analysis. Most of the issues raised by Haines were generic. As the court said, they were general in nature. They argued about the CyPray award. They argued about predominance. They argued about there should be subclasses. And there, those are distinct claims. You have Haines actually arguing in over half of his brief, arguing that the settlement should not have been approved. That failed resoundingly, and that has nothing to do with attorney's fees here. There's no way that Haines can claim credit for the hours worked with respect to that work. You have also, it's important to look at the record back in February 2018. The court at preliminary approval stated, why in the world would I award you 9.48 percent? The court said, shouldn't I instead give you what the class got in Bank of America? In Bank of America, class plaintiffs got 6.2 percent. Guess what we got in this case? We got 6.2 percent. With respect, Judge Rakoff was never going to give us a 9.48 percent award. He expressed skepticism right off the bat before Haines had ever ---- One of the, one of my issues is that it seems to me a pretty poor approximation of the time spent to look at the pages that an argument like his makes. And we both know that lawyers sometimes come up with an argument that is not, does not require much expression in a brief once you come up with it because it's clear and simple to express in a brief. But in order to come to that argument, you would have to wade through all the billings. You'd have to come to the insight, well, these are Brazilian attorneys. That might make a difference. You'd have to do the research. And you would have to be an objector to do all that, which also imposes various costs, various time costs on your work. Certainly agreed. But the issue is, is that that flaw was in the time entries made by Haines. Haines could have designated their work. The record shows us that Haines, most of their arguments, they raised six arguments with their objection. Most of them failed. And so if you're trying to separate out, the Court did only what it could on the record. The Court looked at ---- Sotomayor in your view consider essentially the preliminary necessities of getting to be a claimant in the first instance. What it costs to do that. Did it consider it? Did Judge Rakoff? I think the Court looked at a holistic analysis. I don't think it designated the time spent in informing the objection as a whole. If you would just look, there are already five out of six, you're talking more than 80 percent of the claim was rejected. So of their $117,000 in Lowe's Star, over 85 percent there that was just thrown  It was a 25-page brief. There's simply most of it was found to be not of use to the Court. And so you're already discounting a significant amount. I think what my colleagues are getting at is when the judge focused on the brief in order to come up with his percentage, was there a consideration of what it took to get to that argument, not just the pages of the brief? I'm not sure if the Court specifically looked at that. The issue is, is that, is that what does it really take to file your, to file a brief and launch an objection? It is not a significant amount of time. The declaration that Haines submitted all about the work of CCF was a declaration that was put in dozens of other cases and was just adding on and cumulative. How much really effort does it take to file an objection? You could do it in one paragraph. And then to file a brief, it takes, it took 25 pages and another five pages of supplemental. There was discovery that was performed. The problem is, the part of the brief that was successful, you know, did the judge consider what it took to get to the part of the brief that was successful? There was little record. There was no record to consider that. And Haines had every opportunity. They made a motion to reconsider. They brought whatever evidence they could to the Court. And the Court took a holistic analysis of what the benefit was that Haines performed in this case and found it to be, while they succeeded with respect to the Brazilian claims, they did not succeed with respect to most of the claims and most of their time. The effort involved in this, they asked for a multiplier here. There should be no multiplier. They spent about three weeks involved in this case. And they're trying to say, well, how could you, you know, class counsel receive the multiplier? But they received no multiplier. Our firm was involved in this case for four years, uncompensated. We had put in $14 million in expenses, and we've yet to receive even half of the fees that we've been awarded. CCEF spent a full three weeks on this case. Now they're asking for a multiplier. In addition, it simply does not make any sense. It is certainly within the Court's discretion to deny that. And so really I think a look at Hensley, first of all, is distinguishable on its own. Hensley is not the type of case dealing with an objector, and it does deal with somebody who where most of the claims succeeded, and the Court goes through analysis and found after a trial that it gave a paradigm for awarding attorney's fees. But even applying Hensley, you already have half of the appeal at least, at the very least, that had nothing to do with fees, had to do with predominance, had to do with subclassing, all which were resoundingly objected. And so we think respectfully that Haines' bark is a little louder than in spite here. The district court properly ruled and has broad discretion in these cases, particularly with attorney's fees and significant discretion. It found that Haines' efforts had some value but weren't all that successful. We'll yield our time. Thank you, Mr. Lieberman. Ms. St. John. Thank you, Your Honor. I'm not sure what counsel means by a holistic analysis, but there's nothing in the Court's order suggesting that it considered the overall success or any of the all-inclusive work required for us to make the argument that we did on behalf of Haines. None of the work here was frivolous or unreasonable, and the district court didn't make that finding. The fact is the Brazilian contract attorneys were part of a single fee request. They were not broken out separately. They were included in the same list of over 100 attorneys who worked on the matter. We had to look at one declaration that listed the biographies of the attorneys and which courts they were admitted in, another declaration showing all of the lodestar time for all of the attorneys, and put all of that together just to make that argument. As counsel is investigating these filings and thinking about the issues and doing the legal research, it's just not feasible to put time into buckets the way the court would have had us do or the counsel now is imposing on us. That kind of timekeeping wasn't even required by the district court. And Haines, another issue with this case is that if the district court's decision stands, it creates a situation where class counsel is able to burden objectors who want to participate in the process by imposing abusive discovery on them and hoop-jumping that makes it even harder for them to participate in a process where their claims are the ones being extinguished. And at a point in the process where there's little adversarial presentation to begin with. Finally, using an analogy, this would be as if a plaintiff won a case on summary judgment with two of their 12 arguments being successful, and the court awarded a sixth of lodestar with no time allowed for discovery or filing the complaint. You can't get to that point of the litigation to succeed on arguments, some portion of arguments, without doing a lot of work in the beginning. And so unless there are further questions, we'll rest on our briefs and our argument and ask the court to reverse and remand. Thank you. Thank you. Thank you both. We'll reserve decision in this case. The last case on for, excuse me, for argument this morning is the second Petrobras security litigation appeal, 18-2270. Good morning, Your Honors. Hold on. We're changing some seats. Why don't you have a seat? We'll call you up when we're ready. Sorry. Actually, now that we've cleared up everybody and we've gotten the documents, we're ready to go. Mr. Good morning, Your Honors. My name is Joseph Gulotta. Good morning, Mr. Gulotta. May it please the Court. When the settlement of this class action was negotiated, the shareholders within the class were not represented adequately. There was nobody making the strongest arguments for shareholders when the allocation was decided. As a result, shareholders were left behind. Everyone else came out ahead. The defendants, they won a worldwide release. Class counsel stood to gain a gigantic fee. The non-domestic notes holders weren't even part of the certified class. They won big. They had no claim. And suddenly they had exactly an equal claim as shareholders had in the settlement. The notes group as a whole had a serious risk of not being able to get class certification after this Court's decision. They all received class certification as part of the settlement class and no discount compared to shareholders. It's very important to remember that this litigation class had been decertified by this Court. This Court suggested a subclass for shareholders, and there was an open question, a real risk, as to whether the notes could be certified as a class due to the Morrison problem. The shareholders had absolutely no Morrison problem. They had stronger claims. So when the settlement amount was agreed on with a radical redefinition of the class, at that point there was a need for independent counsel for the shareholders. When class counsel expanded the settlement class to include claimants who could not have been part of any litigation class, that indicates that counsel disfavored the strong claims of the shareholders in order to obtain a bigger settlement. What should we make of the fact that this is not an argument that your parents presented below? My parents did claim on the first page of their objection that the shareholders had domestic claims, and the problem was that debt holders did not. With debt holders, there was an issue as to Morrison, which shareholders did not have. So we believe the relief being sought was that they be excluded from the class, people with Morrison problems, not that subclasses be created. That's correct. We preserved the issue of inadequate representation in the objection. We have changed the remedy sought on appeal. Multiple objectors sought subclassing. This Court suggested subclassing in its opinion. We requested something else, a different remedy in the objection. The reason why that remedy was rejected by Judge Rakoff is Judge Rakoff cited the AIG decision, and he said, without mentioning the Rules Enabling Act, that a court is able to approve of a settlement class that includes nonviable, nonmeritorious claims. At that point, we had to shift the remedy, accepting that AIG decision and Judge Rakoff's decision, then subclassing was the natural remedy. And subclassing is the natural structural protection given in these cases. But how did that argument get made below once the decision was made that you had to shift it? Well, we made the argument for the issue of inadequate representation. As to the remedy, you know, the remedy is some form of structural protection. And, you know, we've revised it in favor of subclassing on appeal. But the issue remains the same. Okay. So you'd have a subclass which was domestic shareholders only or shareholders only. Yes. And then you would have the counsel look to whether the 25 percent uptick for subclasses, you know, that they have Section 11 claims easier to make, that that's good or bad. Is that what you want? More than that. I'm not going to restrict what that subclass counsel, whoever that may be, would negotiate. But there needs to be an adversarial negotiation where somebody is representing the shareholders and saying, hey, wait a second, we have stronger claims. And I think there's either going to need to be a discount for you guys or there needs to be some mechanism for the notes. The domestic note holders, is that who gets the discount? I think the notes group, it may be the notes group as a whole. But that question, because the notes group as a whole has a Morrison problem. Because with a shareholder, yes, every single shareholder simply says, I bought ADS. These trade on the New York Stock Exchange. And that question is done. Every single Morrison, every single notes holder has to say, well, I have these, you know, I traded on this day through this broker, from this person. They have a much more complicated answer. They have a much more complicated hurdle, which shareholders don't have. And Professor Coffey. Nobody told any of this to the district court. That was my question or observation. Did anybody lay this out for the district court? I mean, it seems fairly nuanced. What we articulated to the district court was that there was clearly an interclass conflict, that the shareholders were not adequately represented, that they should have received independent counsel to get a larger, a larger part of the settlement fund. We suggest. You're complaining that the district court then didn't go on from there and do what you are arguing on appeal should have been done. Yes. The, you know, under the Amchem decision, we're absent class members here. You know, Spencer Bueno, Emelina Glaude is here. We're not privy to these proceedings. And we're not, all we get is a class notice, which doesn't mention, oh, by the way, there's a Morrison interclass conflict here. So this one, this is just as Justice Ginsburg said. Amchem says we have to uncover these conflicts. And that's what we did here. We uncovered it for Judge Rakoff. And instead of, and Judge Rakoff was rather dismissive of it. He, I mean, he did spend ten pages of the decision on it, but he didn't frame the analysis in, he framed the analysis in a way that minimized the conflict. For instance, he used this term that we never used. He used this term DTC claimant. And a DTC claimant would be the, those, that part of the class who's standing, you know, who's only in the class because they traded by DTC. We never, we never used that term. We talked about shareholders, that the shareholders were inadequately represented. And then, of course, class counsel said, oh, Judge Rakoff, you don't have to, you don't have to worry about this issue. These DTC claimants, they're only 2 percent. And don't ask us where we came up with that number. There's no calculations, no independent report, just nothing for us to verify, nothing for us to check. And in the Ortiz decision, Justice Souter said, hey, when we have a critical number that we need in order to get class certification, we need some independent, something reliable. We need some independent findings, specific evidentiary findings. And we just can't trust, we just can't make a leap of faith with class counsel here because they stand to gain a gigantic fee here. So, you know, Professor Coffey has recently published an article on Judge Rakoff's decision, and here he articulates the problematic, the troubling dynamic in a settlement like this where the settlement class grows to beyond what the litigation class could have included. He says, the bottom line here is these decisions appear to give defendants great discretion over whether cases that cannot be certified as litigation classes can instead be certified as settlement classes. If defendants have broad discretion in this regard, the likelihood is high that they may use this power to agree to a settlement class chiefly when the settlement terms favor it and undercompensate the class. Thank you. You've reserved two minutes for rebuttal. Thank you. Mr. Lieberman, are you going first or is Mr. Gerber? Mr. Gerber. I wanted to give Mr. Lieberman a break. Good morning, Your Honors. May it please the Court. Jared Gerber from Cleary Gottlieb on behalf of Petrobras. As the panel has caught on to, and as we explained in our brief, the geladas here clearly waive these arguments by failing to raise them below and instead disclaiming them below, saying that there was no ANCAM conflict. That should really be the end of this appeal. Their arguments below weren't just different in terms of remedy. It was also about the nature of the conflict. They were seeking to exclude all non-domestic purchasers using a special master. They weren't seeking subclasses. The objector that was seeking subclasses was seeking different subclasses than the ones at issue here. We think these arguments are clearly waived. Mr. Gelada himself also does not have standing for the reasons that are set forth in the brief. The assignment that he received from his parents is not valid. That should also end this appeal. I think that the argument was different below. But normally it would be waived. But this is a class action. And if assuming a good argument came up about inadequate representation, should the court exercise its discretion to overlook the waiver? Of course, Your Honor. There is an escape valve for manifest injustice. We don't think that's the case here. We think these claims just don't have any merit to begin with. And they're ones that could have been raised below and weren't raised below. So we don't see this as a case where you need to reach the issue. Because you think the shareholders as a group are fairly treated and there's no misallocation? Is that what you're saying? That's part of what I'm saying, that there is no fundamental conflict here. So the issues that are raised on this appeal aren't meritorious, let alone raising the type of manifest injustice that are required to consider a waived argument. So turning to the merits, I do think here that the appeal also fails on the merits. This isn't a case that requires subclasses. It's not a case involving a collusive settlement where counsel representing named plaintiffs from one part of the class sold out another part of the class. It's not a case where the class representatives presenting present claims sold out members that only possess future claims, like in Ankem and Ortiz. It's not a case where class representatives required other class members to receive nothing or bear the risk of receiving nothing, like in literary works and payment card. In short, there's no fundamental conflict here within the class based on the structure of the settlement. In fact, there's no conflict here at all. We're paying a single amount that's being allocated to all of the settlement class members, and the settlement agreement itself does not contain any requirements about how the payment is divided between the class members. I'm not exactly sure what your problem is here. This is a question, as I understand it, about representation so that you get a fair allocation. So I didn't know that anybody was actually at this point challenging the settlement as such, the amount, the settlement, or ---- I absolutely agree, Your Honor. You're 100 percent correct. So what are you doing? And at the end of the day, even if you find merit in what he, what Mr. Gelada argues, the settlement should remain in place and there should just be a reallocation. I think it's, it may have been unclear from the papers, so I just wanted to make it clear that there is no problem with the settlement here. There's no structural problem. There's no fundamental conflict. And if the court found a fundamental conflict here based on this sort of merits issue, just a minor difference in the strength of the claims, there would be innumerable, innumerable subclasses because of the differences here. My time is up, so unless the Court has other questions. Thank you. Roberts. Thank you, Your Honors. There was a reason why there's been a 180 in the Gelada's positions between the district court and the appeal. It's not for chance because initially Gelada said you should excise all DTC-only class members. And the court said, well, if we had in North Carolina, in Hawaii, domestic-only claims, which Gelada would admit is a domestic-only claim, then they would have had adequate representation and there simply would have been no problem. They would have therefore been forced to make sure that they were adequately represented, domestic-only, which was Gelada's argument below. Then he didn't – obviously that was a problem for him. That posed an issue. So he reversed course. He said, well, the problem isn't domestic versus non-domestic. It's bond versus class members. And there's a reason why he made that change. It didn't come – it doesn't come from a vacuum. But let's again look at the content. He says that the stock purchasers were inappropriately and inaccurately represented. The university superannuation scheme suffered $83 million in losses on their Petrobras securities. 99.99% of those losses were on the ADS shares. 0.0001% of the losses were in the bonds. USS had every incentive to increase and maximize their recovery. Why in the world would they short shrift the shareholders? North Carolina, same issue. 97% of their losses were based on the ADS transactions. 3% were based on bonds. Once again, why would they short shrift? So Gialotti is basically looking for some problem, some issue, so he can hang the hat on. But it simply doesn't hold water. And his solution to this quote-unquote problem creates even more of a disaster. You've got – he's going to give you bondholders in one class and note purchasers in one class. And what are you going to do with the bondholders now? Are you going to give a discount to all of them? That's completely unfair. And that's why he didn't argue that below. Most of the bondholders – even Gialotti admits most of the bondholders here are domestic. Why are you going to give them a discount? That doesn't make any sense. So then is he going back and saying we should make a determination between domestic versus non-domestic bondholders? Gialotti gives the answer himself. He says it's hard to figure out what's a domestic transaction versus what's not a domestic transaction. And, therefore, it's difficult to go through that analysis. He doesn't even want to go through that analysis. You can't criticize us. We had a declaration by the claims administrator who said if they're going to make a Morrison analysis, and respectfully to this Court, the absolute activist can be vague in his treatment of Morrison, you're going to ultimately engage in a cost-intensive extended process that's never going to end. And Gialotti gives the answer once himself. What's going to be the result? In his own words, objections will emerge. Because if we're going to go out and start making Morrison determinations like Gialotti wants, I'm going to have a whole line of hundreds of objectors saying you didn't get this right on Morrison. I purchased in the United States, but this guy didn't. He purchased outside. But his purchase was from a domestic entity. He shouldn't be included. So we're going to have a myriads of objections. So we were as practical as possible. We said we can either go through this process, which is going to be very exacting, very time-consuming, or we can treat everybody equally. And in all the cases that Gialotti cites, Literary Works, Amchem, Ortiz, none of them treated the other side equally. Here we have everybody. They all bought the same security. Every bond is the same security as the next. And we treated everybody the same. You say that the overwhelming majority of the note holders were domestic. Could you explain the methodology that allows you to make that assertion? It's twofold. And so one is just simply the record in front of the court. The individual actions filed their own claims based on bonds. Of the $12 billion in transactions, only $125 million were dismissed. The Inca bonds were dismissed on domesticity. That's 1%. Now, Gialotti says, well, there were five out of 11 individual plaintiffs who were dismissed. He omits the fact that all of them repled, and they weren't challenged by defendants. Defendants, if they had a good challenge for those plaintiffs on Marston, they would have brought it. So 99% of the individual actions, $12 billion worth of bonds submitted in this case were based upon domestic. Now, what was the calculation that we did at the District Corporate Law? We did something different. We said, well, let's look at the series of bond holders. 70% of the holders were located in the United States. So you've got 70% of the purchasers located in the United States. Then the question is, is of those, the remaining 30%, are they purchasing or selling from a domestic entity or a foreign? And so if you just do the math, you've got those 30% 70% of that 30% transactions are going to be from a domestic entity. That's going to qualify under absolute activists. So it would be around 9% of the transactions within the bonds that are going to be potentially under that calculation non-domestic, but of the whole class, that's 2% because it's only 25. You're doing the 9% times .25. That was actually a conservative estimate that we gave to the court. If you actually look, it's a much better estimate. Look at the record. Look at the individual actions. $12 billion in bonds, only $125 million were dismissed. It's 99%. So we had a question. Do we want to go and ferret out and try to ferret out this 1% and give them a discount and take the time? Is that in the best interest of the class? Or should we move this process along and do this in an effective way and treat everybody equally? And let's be clear, the DTC only claims. They have claims. First of all, they have a right of appeal. The Choi case that we cite actually talks about that if the matching is done in the United States, that's sufficient under Morrison. The matching is done when you do a DTC transaction. So they had a right of appeal. Defendants have the right to extinguish that right of appeal. But even if somehow there was no jurisdiction in the United States, they do have a claim, potentially in the Netherlands. That doesn't necessarily provide for an automatic discount. Defendants have every right to try to settle those claims. And so at the end of the day, we had the ability to settle the claims. Giulotta is somewhat unclear. Is he arguing against the settlement or is he arguing against the plan of allocation? There's broad discretion with the plan of allocation. We do also want to firmly state Giulotta standing here today does not have standing as a pro se appellant. He received an assignment from his parents where his parents retained the ability to represent Giulotta with respect to the class proceedings. Under New York law, when there's a retention of interest and a lack of complete divestiture, there's an invalid assignment. Is that just a technical issue that we're raising? Absolutely not. Because then if Giulotta here does not have a valid assignment, he is actually engaged in the unauthorized practice of law. Now, that is important here. Because why? Because Giulotta does have a history. He was actually admitted to criminal theft in 2005. In the Tyco settlement, he brought his own — he brought an objection on behalf of his father, who didn't appear today. And he received for filing a lawsuit against the — All this is in the record. All this is in the record. But we do think it's important. There's not one institutional investor who has a real financial interest who is objecting to the settlement. The class members are awaiting their distribution. Can I ask about institutional investors again? Sure. I think the essential objection is inadequate representation. Yeah. So you're saying that even though some of these — the named plaintiffs have both debt and shares, that the shares are overwhelming? That's in the record, 99.9 percent. They had every interest to increase the shareholder recovery, and they did so. Thank you. Mr. Giulotta. I'm asking that question so you would respond to it. He says the shareholders are getting plenty of representation because of the composition of the holdings of, I guess, North Carolina and Hawaii, et cetera. And he said this really isn't inadequate representation. So can you answer that? Sure. Two points. First of all, in literary works — No, just answer that question, not about literary works. Just answer the question. How are they unrepresented? Well, Hawaii and North Carolina admitted at the fairness hearing that they were arguing against the shareholders. They said that they were the ones who were arguing for the Section 11 premium. So out of their own mouths, they said we were arguing against the shareholders because it's the shareholders who were paying — Yes. But their shareholder interest was extremely large. Their shareholder interest was large. I don't know what their individual balance was, but for whatever reason, they were arguing for a Section 11 premium, and that was a priority for them. And that was paid for by the shareholders. And literary works said that if you have a class representative in multiple categories, that's not enough. So that's, you know, the law of the Second Circuit. On the issue of waiver, we never argued in the original objection. The argument was not domestic versus non-domestic claimants. That wasn't in the objection papers. If you look at the first page of the objection, it refers to shareholders versus debt holders. And that's, you know, that's a consistent theme throughout the objection, that here's the shareholders inadequately representative. The debt holders have this Moorishan issue that the shareholders don't have. On this issue of waiver, I think the Third Circuit has it right in the NFL concussion case. We've cited in 26 — page 26 of our reply brief regarding the relaxation of the waiver standard in class actions, precisely because there is nobody speaking for — there's nobody speaking for these underrepresented subgroups. And I also rely heavily on the Second Circuit's decision in Ford v. Bernard, which really clarified that when there the Second Circuit said, unlike the appellant in Singleton, the Supreme Court case, who raised an entirely new issue on appeal, here the appellant is offering a new legal argument that concerns an issue already considered at some length by the district court. And Judge Rakoff did consider at length this issue of stronger versus weaker claims. To agree with some of the appellees, we are seeking just limited remand here. And we take no position — to clarify, we take no position on what the bondholders will do, if they want one subclass or two subclasses or if they can work out a superior structure. Our point is we need adequate representation for the allocation for the shareholders. As to the question on methodology, if you really look at the papers, what there is is a conclusory mention of statistical analysis. That's how this 2 percent number comes up. And that's not enough under these circumstances. And there I do rely on Judge Souter's reasoning and Ortiz. What we need is serious advocates fighting it out to get a reliable number in which the court and the appellate court can have confidence. And then that might be another day, if it turns out that it is truly some small number, then it might not be worth subclassing. But all of Judge Rakoff's rulings indicate that it's 50 percent of the class representatives or 30 percent of Inka's transaction. These are big numbers of the class of notes holders who can't seem to satisfy Morrison, and in a settlement of $3 billion, where the claims rate for notes holders may be much higher than for retail shareholders. Notes holders might be getting $1.5 billion of the settlement, and if 30 percent of those are non-domestic, then we're talking about $500 million, not $60 million. And even if it is $60 million, that's still a serious chunk of change. Thank you. Thank you, Mr. Gelato. Thank you, all three of you. We'll reserve decision in this case. That ends our calendar of arguments for the day, so I will ask the clerk please to adjourn court. Court is adjourned. Thank you.